# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

### (TAMPA DIVISION)

| | |
|---|---|
| KAREN BODDISON, DARR HAWTHORNE, and ALEX HOGAN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> GENERAL MOTORS LLC, a Delaware limited liability company, <br><br> Defendant. | **Case No: 8:20-cv-02139** <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT FOR:** <br><br> 1. **VIOLATION OF FLA. STAT. § 502.201,** *et seq.***;** <br> 2. **VIOLATION OF FLA. STAT. § 672.313 and 680.21** <br> 3. **VIOLATION OF FLA. STAT. § 672.314 and 680.212** <br> 4. **VIOLATION OF CAL. CIV. CODE § 1750,** *et seq.***;** <br> 5. **VIOLATION OF CAL. CIV. CODE § 1790,** *et seq.***;** <br> 6. **VIOLATION OF CAL. BUS. & PROF. CODE § 17500,** *et seq.***;** <br> 7. **VIOLATION OF CAL. BUS. & PROF. CODE § 17200,** *et seq;* <br> 8. **VIOLATION OF MO. REV. STAT. § 401.010,** *et seq.***;** <br> 9. **VIOLATION OF MO. REV. STAT. § 400.2-313;** <br> 10. **VIOLATION OF MO. REV. STAT. § 400.2-314;** <br> 11. **FRAUDULENT OMISSION;** <br> 12. **UNJUST ENRICHMENT;** <br> 13. **NEGLIGENCE; AND** <br> 14. **VIOLATION OF MAGNUSON-MOSS WARRANTY ACT 25 U.S.C. §§ 2301,** *et seq.* <br><br> **<u>JURY TRIAL DEMANDED</u>** |

1

Plaintiffs Karen Boddison, Darr Hawthorne, and Alex Hogan (collectively "Plaintiffs") bring this class action on behalf of themselves and all others similarly situated against defendant General Motors LLC ("GM" or "Defendant"). Based on personal knowledge as to matters relating to themselves and their own actions, and on information and belief based on the investigation of counsel, including counsel's review of consumer complaints available on the database of the National Highway Transportation Safety Administration ("NHTSA") and other publicly available information, as to all other matters, Plaintiffs allege as follows:

## I.       INTRODUCTION

1.       General Motors LLC is a maker of automobiles based in the United States; Defendant designs, manufactures, and sells vehicles under a variety of makes, including the "GMC" and "Chevrolet" vehicles at issue in this matter.

2.       As part of their marketing efforts for vehicles under the GMC and Chevrolet brands, Defendant advertises numerous in-dash entertainment and safety features available through its "Infotainment" systems (branded by Defendant as the "MyLink," "Intellilink," or generally as "Infotainment" systems) on a variety of models.  As GM tells consumers, the "Infotainment" system present in the Class Vehicles is supposed to provide the drivers with information from the vehicles' various sensors, display vehicle health status, show video feeds from backup and other cameras, display lane assist warnings, utilize the in-vehicle navigation system, interface with the vehicles' instrument cluster; interact with OnStar (which provides navigation information and roadside assistance if a crash or other safety event occurs), and inform the driver of certain safety indicators; and likewise allows drivers to utilize a suite of entertainment and communication features, including but not limited to being able to make and receive hands-free calls through their cell phones, get text message alerts, and play music.

3.       Consumers care deeply about the technology present in their vehicles, including the presence and implementation of safety features and how their vehicles are able to connect them with other technology they use in daily life.  Indeed, GM regularly touts its efforts to improve

its in-vehicle connectivity and Infotainment offerings, for example, through various press releases from 2017 to the present.[1]

4.      Defendant has prominently advertised the features associated with its Infotainment systems since at least April 2017 and has continued to do so to the present.[2]

5.      Among the Infotainment systems installed in GMC and Chevrolet vehicles is the 7-inch "IOR Infotainment" system (the "Defective Infotainment System" at issue in this litigation).

6.      Likewise, Defendant touts its commitment to customer safety in its advertising materials.  As they note on their website for Chevrolet branded vehicles as recently as December 15, 2020, Defendant tells its customers that "[customer] safety and well-being are at the core of everything we do.  Because we always have you in mind, our vehicles offer advanced technology to help you drive as safely as possible."[3]

7.      But Defendant fails to deliver on its promise to use "advanced technology to help you drive as safely as possible."  In fact, Defendant's reliance on its flawed "advanced technology" creates issues that would not exist without Defendant's purported "advanced technology."  Defendant's Defective Infotainment Systems exhibits the following defective behaviors, including but not limited to: unexpected spikes in volume; becoming inoperable; freezing and rebooting frequently; continuing to play audio despite the vehicle being shut down and the driver exiting the vehicle; and failing to resolve the backup camera when the vehicle's

---

[1] E.g., https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2019/sep/0905-technology.html; https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2020/nov/1109-techjobs.html; https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2017/dec/1205-marketplace.html

[2] Available at: https://web.archive.org/web/20170402160807/https://www.ch-evrolet.com/owners/ mylink-vehicle-technology

[3] https://www.chevrolet.com/safety; similar representations are made by GM with regard to GMC vehicles at: https://www.gmc.com/index/miscellaneous/safety.html#vehicle-lineup.html

gearshift is placed in the "Drive" position. As a result, the Defective Infotainment Systems do not operate in the manner a reasonable consumer would expect. Instead of consumers' safety and wellbeing being "at the core of everything" Defendant does, Defendant prioritized its own sales and profits.

8.      Issues with Defendant's Defective Infotainment System have been well known by Defendant for years. Consumers have been submitting complaints detailing the issues complained of herein to the National Highway Transportation Safety Administration for years preceding Plaintiffs purchase of their vehicles. Automotive and consumer publications, blogs, and forums that Defendant monitors, or should monitor, are replete with instances of consumers complaining of issues with their infotainment systems, and Defendant has received warranty requests and reports from dealers and repair facilities regarding the infotainment systems sufficient to apprise them of the issues.

9.      In recognition of the issues described above, on December 5, 2019, GM submitted Technical Service Bulletin No. PIT5722 (the "December 2019 Bulletin") to NHTSA regarding a defect inherent in certain GM vehicles equipped with a "IOR 7-inch in-dash Audio System" that manifests by causing the "radio volume [to] ramp up to maximum without input to the volume controls"[4]; on information and belief, this defect is present in all GMC and Chevrolet branded vehicles equipped with the "IOR 7-inch in-dash Audio System." The December 2019 Bulletin is attached hereto as Exhibit A as though fully incorporated herein.

10.     In the December 2019 Bulletin, GM identified a dangerous defect in certain 2019 Chevrolet and GMC Vehicles equipped with the Defective Infotainment System that can result in the volume rapidly increasing to the maximum without user input while the driver is operating the vehicle. The sudden and unanticipated noise that manifests while a driver is operating the vehicle can, and has, resulted in surprise, disorientation, and/or distraction to the driver, and increases the potential for a collision and injury. When customers present their vehicles to an

---

[4] NHTSA Technical Service Bulletin PIT5722.

4

authorized repair facility for repair under the applicable warranties, GM declines to replace or repair the Defective Infotainment System, cannot do so effectively, or declines consumer requests for reimbursement. GM has not recalled the dangerous and unusable Defective Infotainment System.

11.     On March 24, 2020 GM issued Technical Service Bulletin No. 20-NA-012 (the "March 2020 Bulletin") detailing a software update that reduces, but does not eliminate, occurrence of unanticipated volume spikes in Model Year 2020 Chevrolet Blazer, Camaro, Colorado, Equinox, Sonic, Trax, and Silverado 1500, 2500HD, and 3500HD as well as Model Year 2020 GMC Canyon, Terrain, and Sierra 1500, 2500HD, and 3500HD vehicles equipped with the dangerous Defective Infotainment System. The March 2020 Bulletin is attached hereto as Exhibit B as though fully incorporated herein. Defendant has not updated, replaced, or amended the March 2020 Bulletin since its issuance.

12.     On October 12, 2020 GM issued Technical Service Bulletin 20-NA-097 the "October 2020 Bulletin" that identified a software update for the 2019 Class Vehicles that would purportedly fix the issues with the Defective Infotainment System. The October 2020 Bulletin expressly states that it replaced the December 2019 Bulletin and included a warranty code for dealers and authorized repair facilities to submit to GM when Class Vehicles were updated. On information and belief, on or about November 3, 2020, GM deployed an over-the-air update to the 2020 Class Vehicles that would purportedly fix the infotainment issues (the "November Update"). Notably, GM has not posted any update to the March 2020 Bulletin as it did for the December 2019 Bulletin after the October 2020 Bulletin was published. The March 2020 Bulletin and October 2020 Bulletin include warranty codes for dealers and authorized repair facilities to use when customers brought their vehicles in for a software update. The December 2019 Bulletin instructs service personnel to not attempt repairs and includes no warranty claim code.

13.     On information and belief, GM rushed the purported "fix" for the Class Vehicles without adequately ensuring that the software update would remedy the Defective Infotainment System.

14.     Indeed, the software updates have not remedied or eliminated the Defect. Instead, customers who brought their vehicles in for the software update, or had it installed over the air in their 2020 Class Vehicles, have seen more frequent occurrences of the Infotainment System Defect. For example, Plaintiff Alex Hogan brought his vehicle in to a GM authorized repair facility after experiencing repeated manifestations of the defect. The service personnel informed Mr. Hogan that there was an update that would address the issues he was having with the infotainment system and installed that update on his class vehicle. After the update was installed, Mr. Hogan began to experience more frequent manifestations of the defect than before the update had been installed. Additionally, Plaintiff Hawthorne had the software update installed over-the-air for his 2020 GMC Canyon but the update failed to remedy the issues of which he complained and instead caused them to occur more frequently.

15.     On information and belief, the same dangerous condition is present in all GMC and Chevrolet vehicles equipped with the "IOR 7-inch in-dash Audio System" that gave rise to the December 2019 Bulletin.   Accordingly, all GMC and Chevrolet vehicles that include the Defective Infotainment System are the "Class Vehicles."

16.     As a result of the defect alleged herein, the Defective Infotainment Systems in Class Vehicles present an immediate risk of physical injury and increased likelihood of collision when used in their intended manner and for their ordinary purpose.

17.     The Defective Infotainment Systems in Class Vehicles violate the express warranties offered by Chevy and GMC because GM cannot eliminate the dangerous and unanticipated volume spike, the persistent ringing, or the failure of the rearview image display to resolve per NHTSA safety mandates in order to conform the Class Vehicles with the applicable express warranties.

18.     The Defective Infotainment Systems in Class Vehicles violate the implied warranty of merchantability that accompanies the Class Vehicles because the dangerous and defective conditions described above existed at the time of sale and renders the vehicle unfit for the ordinary purpose for which the Class Vehicles are used and GM cannot conform the Class Vehicles with the implied warranty of merchantability or NHTSA safety regulations.

19.     Though it previously declined to repair the Defective Infotainment Systems when Class Vehicles were presented for warranty repairs, since October 2020, GM has offered warranty repairs for the same issues arising from earlier model years and identifies a warranty code for dealers who install the October 2020 Update. On information and belief, GM attempted to repair the Defective Infotainment System under warranty by distributing the update over-the-air to affected 2020 model year vehicles. Unfortunately, GM's most recent attempt to repair the Defective Infotainment Systems has failed and the Class Vehicles remain defective.

20.     GM has long known of the Defective Infotainment System issues in the Class Vehicles, despite marketing Class Vehicles as safe and dependable. GM also represents its warranties in its marketing material despite being unable, or unwilling, to honor their warranties in the case of the Defective Infotainment System. Customers rely on these warranties when deciding what vehicle to purchase or lease and what amount to pay for the vehicle. On information and belief, GM has received thousands of warranty requests related to the Defective Infotainment System in Class Vehicles.

21.     Owners and lessees of the Class Vehicles are forced to continue driving their vehicles because GM has not adequately repaired the defective condition and has not offered to provide loaner vehicles pending a repair. The only other option for Plaintiffs and members of the class is to sell their new vehicles at a loss, or spend their own money to rent a car, pending a remedy. Lessees have no alternative but to break their lease at a significant financial penalty. For most Americans, this solution to a problem of General Motor's making is untenable. GM refuses to compensate consumers for the diminished value of their vehicles or provide loaner

vehicles. Plaintiffs and members of the Class simply want the vehicles that they were told they were purchasing or leasing.

22.    While GM knew about the Defective Infotainment System and the associated dangers, GM manufactured, marketed, sold, leased, and warranted the Class Vehicles, and, in its quest for corporate profits, did not disclose to the unsuspecting public or to purchasers that the Class Vehicles were inherently defective, dangerous and create a grave risk for bodily harm or death.

23.    On information and belief, GM was aware of numerous internal technical reports and customer complaints associated with the Defective Infotainment System. GM did not disclose, and to this day has not fully disclosed, what it knew about the Defective Infotainment System to prospective and actual purchasers and lessees. Had GM disclosed the Defective Infotainment System to purchasers or lessees they would not have purchased or leased the Class Vehicles or would have paid less to do so.

24.    From December 2019 to October of 2020, GM refused to repair affected vehicles, stating to its dealers only that "Engineering is analyzing the issue.  Please do not replace any parts for this concern.   Additional information will be made available once analysis is complete." Many owners and lessees who brought their vehicle in for repair before October were turned away without resolution and without alternate transportation.

25.    Owners and lessees who have had their vehicles updated under the October 2020 Bulletin, have not had their vehicles repaired and have experienced increasingly frequent manifestations of the defect. Similarly, the March 2020 Bulletin identifies that the same Defective Infotainment System issue is present in the Model Year 2020 Class Vehicles but that the software update only reduces, but does not eliminate, the dangerous and disorienting volume spikes emanating from the Defective Infotainment System.  As a result, owners and lessees of the Class Vehicles are unknowingly driving on roads and highways in potentially ticking time bombs while GM knowingly exposes its customers, from whom it made at millions of dollars

from the sale of just the Class Vehicles, to the risk of grave physical harm and even death. GM has not informed affected owners and lessees that they can bring their vehicle in for an update and a consumer will only know to do so if they regularly monitor NHTSA.

26.     Separately, with or without a viable remedy for the Defective Infotainment System, the defective condition has decreased the intrinsic and resale value of the Class Vehicles and Plaintiffs and other Class members have been damaged and diminished as a result.

27.     Throughout the relevant period, GM's marketing of the Class Vehicles was and is replete with assurances about their safety and dependability. A vehicle equipped with a interface device that rapidly increases its volume to the maximum without user input, surprising, startling, or causing distraction to the driver, goes black and cannot be manipulated by the driver, plays audio even after he vehicle has been shut off and the driver has exited, fails to display crucial information to the operator, and has a faulty rearview image display is inherently unsafe and renders GM's marketing of the Class Vehicles untrue and materially misleading. Plaintiff and other Class members have been damaged as a result.

28.     Plaintiffs, on behalf of themselves and the Classes (defined below), seek redress for GM's egregious and unconscionable misconduct, assert claims on behalf of National, Florida, California, and Missouri classes for violations of: (1) Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 502.201, et seq.); (2) Breach of Express Warranty (Fla. Stat. §§ 672.313 and 680.21.); (3) Breach of Implied Warranty of Merchantability (Fla. Stat. §§ 672.314 and 680.212.); (4) California's Consumer Legal Remedies Act (Cal. Civ. Code § 1750, et seq.); (5) California's Song Beverly Consumer Warranty Act (Cal. Civ. Code § 1790, et seq.); (6) California's False Advertising Law (Cal. Bus. & Prof. Code § 17500, et seq.); (7) California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, et seq.); (8) Missouri's Merchandising Practices Act (Mo. Rev. Stat. § 401.010, et seq.); (9) Breach of Express Warranty (Mo. Rev. Stat. § § 400.2-313); (10) Breach of Implied Warranty of Merchantability (Mo. Rev. Stat. § § 400.2-314); (11) Fraudulent Omission; (12) Unjust Enrichment; (13)

Negligence; and (14) a claim for violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq. In addition, Plaintiffs seek an order enjoining GM's conduct, directing it to inform Class members of the Defective Infotainment System and to cease driving their vehicles, directing GM to contact Class members and advise them that it will provide free loaner vehicles of the type of Class Vehicle each owns or leases until a remedy for the Defective Infotainment System is installed in their Class Vehicles; compensatory damages; restitution; and punitive damages.

## II.     JURISDICTION AND VENUE

29.    Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiff and at least one Defendant are citizens of different states and satisfy the diversity requirement, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

30.    Subject matter jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiff's Magnuson-Moss Warranty Act claim arises under federal law, and this Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

31.    This Court has personal jurisdiction over GM because GM conducts substantial business in this District and some of the actions giving rise to this action took place in this District and/or caused injury to property in this state; and products, materials, or things processed, serviced, or manufactured by GM anywhere were used or consumed in this state in the ordinary course of commerce, trade, or use. GM is one of the largest manufacturers and sellers of automotive vehicles in the world. Defendant has, at all relevant times, conducted and continues to conduct business in Florida, and every other state in the country.

32.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, GMC has caused harm to Plaintiff and other Class members in this District, and GMC is a resident of this

District under 28 U.S.C. § 1391(c)(2) because it is subject to personal jurisdiction in this District. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

### III.     PARTIES

**A.     <u>Plaintiff Karen Boddison (Florida)</u>**

33.     Plaintiff Karen Boddison is and, at all times relevant hereto, was a resident of Manatee County and a citizen of Florida.

34.     Plaintiff Boddison purchased a new 2019 Chevrolet Colorado from Cox Chevrolet in Bradenton Florida, on or about August 28, 2019. Plaintiff Boddison's vehicle was manufactured after May 1, 2018. Plaintiff Boddison's vehicle has a Defective Infotainment System and is a Class Vehicle.

35.     Prior to purchasing her vehicle, Plaintiff Boddison was exposed to GM's advertisements, reviewed Defendant's marketing and information pamphlets, reviewed the vehicle's window sticker, and interacted with a salesperson, all without Defendant, or its agents, disclosing the Defective Infotainment System.

36.     Plaintiff Boddison purchased her Class Vehicle with the Defective Infotainment System as part of a transaction in which GM did not disclose material facts related to the automobile's essential and expected purpose – safe transportation. Plaintiff Boddison did not receive the benefit of her bargain. She purchased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Plaintiff Boddison's vehicle is equipped with the Defective Infotainment System which has significantly diminished the value of Plaintiff Boddison's Class Vehicle. Had GM disclosed the Defective Infotainment System, Plaintiff Boddison would not have purchased her Vehicle, or certainly would have paid less to do so.

37.     Plaintiff Boddison only became aware of the Defective Infotainment System shortly after purchasing the vehicle. Within two months of purchase, Plaintiff Boddison was

traveling in the vehicle at speed when she was subjected to the sudden and jarring blast from the radio. Plaintiff Boddison brought her vehicle to Cox Chevrolet and explained the issue to technicians there. Cox Chevrolet performed a diagnostic and discovered that the condition was the result of a "software anomaly," but that no software update was available at the time. Plaintiff Boddison suffered subsequent occurrences of the issue and brought the vehicle back to Cox Chevrolet for warranty repairs due to the Defective Infotainment System in March 2020. Again, technicians were able to identify the issue but were unable to remedy it as GM has not yet determined the appropriate method of repair.

38.     In summer of 2020, Plaintiff Boddison was driving the vehicle with the radio intentionally turned to low volume when the volume suddenly "ramped up" to the maximum level. The sudden and jarring sound momentarily disoriented her causing her to lose control and veer off the road almost colliding with a roadside object. Plaintiff Boddison has continued to experience jarring volume spikes while operating the vehicle; likewise, she has also noticed noises emanating from the speakers, like the ringing associated with the Bluetooth communication system, after the vehicle had been completely shut down.

39.     Having suffered repeated manifestations of the defect since the vehicle was examined in December 2019 and March 2020, Plaintiff Boddison took the vehicle to Cox Chevrolet for warranty repair in August and was told that though the problem had been identified, there was no known repair and that it was unknown when a repair would be available.

40.     After Plaintiff Boddison requested warranty repairs from Chevrolet Customer Assistance, she received an August 4, 2020 email from CustomerCare@chevrolet.com stating, in part, "…no compensation will be provided as [your claim] was denied and no repairs will be made…" (emphasis added).

41.     On August 17, 2020 Chevrolet Customer Assistance sent Plaintiff Boddison a letter stating that it would offer Plaintiff Boddison "Component Coverage" over certain "Driver Info & Entertainment components." However, when Plaintiff Boddison contacted Cox Chevrolet on

August 28, 2020 for the same previously requested repair, she was told that no repair could be performed because none was available. The only update to the December 2019 Bulletin is the October 2020 Update, which does not remedy the issues and in many cases has exacerbated the issues.

### B.   **Plaintiff Darr Hawthorne (California)**

42.     Plaintiff Darr Hawthorne is, and at all times relevant hereto, was a resident of Los Angeles County and a citizen of California.

43.     Plaintiff Hawthorne purchased a new 2020 GMC Canyon from Motor City Buick GMC in Bakersfield, California on October 31, 2019. Plaintiff Hawthorne's vehicle was manufactured after May 1, 2018. Plaintiff Hawthorne's vehicle has a Defective Infotainment System and is a Class Vehicle. Plaintiff Hawthorne's CLRA venue declaration is attached hereto as Exhibit E.

44.     Prior to purchasing his vehicle, Plaintiff Hawthorne was exposed to GM's advertisements, reviewed Defendant's marketing and information pamphlets, reviewed the vehicle's window sticker, and interacted with a salesperson, all without Defendant, or its agents, disclosing the Defective Infotainment System.

45.     Since owning his new GMC Canyon, Plaintiff Hawthorne has experienced consistent and repeated manifestations of the defect. While he is driving the vehicle, the Infotainment System will randomly reboot without input from the driver. When the Infotainment System starts up again, it blares the navigation instructions or radio at full volume which distracts and disorients the driver. Often, Plaintiff Hawthorne will be unable to interact with the Infotainment System after it reboots and he must pull to the side of the road and shut off the ignition and restart the vehicle in order to stop the disorienting volume spike. Every time he does so he is placed in a position of vulnerability and danger as he is stopped on the side of the road while traffic passes at speed around him. Stopped vehicles present an increased risk of

collision as vehicles coming from behind may not realize the stopped vehicle is not in a traffic lane.

46.     Plaintiff Hawthorne also has experienced the failure of the rearview image to resolve after he shifts from the "Reverse" gear to "Drive." His rearview camera will either hesitate to change display from the rearview image to the infotainment display for an unreasonable amount of time or turn completely black upon being shifted into "Drive" from "Reverse."

47.     Plaintiff Hawthorne noticed the seller of his vehicle of the breach of express and implied warranties while within his warranty period when he reported manifestation of the defect directly to the seller and again when he brought his vehicle in for repair and was denied a remedy. Plaintiff Hawthorne also noticed Defendant, through counsel, of the same via a letter prior to his filing suit.

### C.     Plaintiff Alex Hogan (Missouri)

48.     Plaintiff Alex Hogan is, and at all times relevant hereto, was a resident of St. Charles County and a citizen of Missouri.

49.      Plaintiff Hogan purchased a new 2019 Chevrolet Colorado from Bommarito Chevrolet South in St. Louis, Missouri, on or about March 23, 2019. Plaintiff Hogan's vehicle was manufactured after May 1, 2018. Plaintiff Hogan's vehicle has a Defective Infotainment System and is a Class Vehicle.

50.     Prior to purchasing his vehicle, Plaintiff Hogan was exposed to GM's advertisements, reviewed Defendant's marketing and information pamphlets, reviewed the vehicle's window sticker, and interacted with a salesperson, all without Defendant, or its agents, disclosing the Defective Infotainment System.

51.     Plaintiff Hogan began experiencing issues with the Defective Infotainment System while it was still under the original manufacturer's warranty. After noticing reoccurring issues that he subsequently identified as being associated with the Defective Infotainment System,

Plaintiff Hogan called his dealer and informed him of the issues he was having with the Infotainment System. He was told by the dealer that they had not heard of the issue before and that they were unaware of what might be causing the issue and knew of no remedy. Plaintiff Hogan, after experiencing further occurrences of the Defect and while within his warranty period, then called GM customer service on or about October 29, 2020 to report the issue and to ask what could be done. GM customer service told Plaintiff Hogan that they were not aware of the issue and could not offer a remedy. Notably, Plaintiff Hogan called GM customer service after the issuance and distribution of the December 2019 Bulletin and was not told of its existence.

52.    When Plaintiff Hogan did bring his vehicle in to his dealer to remedy the issue, he was told that he would have to pay roughly $120.00 to have the October 12, 2020 software update installed in his vehicle despite reporting the manifestation of the defect during his warranty period. Mr. Hogan reluctantly paid the fee and the software update was installed on his vehicle. After the purported software remedy was installed, Plaintiff Hogan suffered the same manifestations of the defect but with increased frequency.

53.    While driving, the Infotainment System would spontaneously reboot and, after coming back online, would fluctuate between maximum volume and minimum volume without input from the driver. More concerning, the volume controls would not respond to driver input and the only way to stop the volume fluctuation is to pull the vehicle off the road, shut off the ignition, open and close the driver door and then restart the vehicle. On one occasion, Plaintiff Hogan was travelling with his young children who were suddenly subjected to an ear-piercing volume spike and he was forced to pull over to resolve the noise placing himself and his children in danger of being struck by moving traffic.

54.    The software update installed on Plaintiff Hogan's vehicle pursuant to the October 2020 Bulletin did not remedy the issue but exacerbated it. Not only does this defective condition present a safety issue to a driver but Plaintiff Hogan has suffered a manifestation of the defect

while his young children were in the vehicle. They were subjected to sudden and ear-piercing volume spikes and Plaintiff Hogan could not alleviate the condition until he pulled to the side of the road and performed the necessary steps to halt the unwanted volume spike.

55.     Plaintiff Hogan provided notice of breach of express and implied warranties directly to GM and the seller of his vehicle when he reported manifestation of the defect to both during his warranty period and again via a letter to GM's counsel prior to filing this action.

### D.     Defendant General Motors LLC

56.     General Motors LLC ("GM") is a Delaware limited liability company, with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware corporation, with its principal place of business in the State of Michigan and is a citizen of Delaware and Michigan.

57.     GMC is a wholly owned brand, subsidiary, and/or division of GM. GM employs engineering, legal, compliance, and regulatory personnel to make decisions regarding the subject GMC vehicles. These employees, on behalf of GM, ultimately made or ratified the decisions that allowed the subject GMC vehicles to be fraudulently designed, manufactured, marketed, and sold.

58.     Chevrolet is a wholly owned brand, subsidiary, and/or division of GM. GM and employs engineering, legal, compliance, and regulatory personnel to make decisions regarding the subject Chevrolet vehicles. These employees, on behalf of GM, ultimately made or ratified the decisions that allowed the subject Chevrolet vehicles to be fraudulently designed, manufactured, marketed, and sold.

## IV.    FACTUAL ALLEGATIONS

59.    GM is the world's fifth largest manufacturer of automotive vehicles and sells its vehicles across the United States through a network of over 4,100 dealers, including those in Florida, California, and Missouri ("Class Markets").

60.    GM maintains a GMC brand where it designs, manufacturers, markets and sells Chevrolet branded vehicles across the United States, including in the Class Markets.

61.    GM also maintains a Chevrolet brand where it designs, manufacturers, markets and sells Chevrolet branded vehicles across the United States, including in the Class Markets.

62.    GM has branded itself, inclusive of the Chevrolet and GMC brands, as the maker of safe, dependable vehicles and has spent millions, if not billions, of dollars on extensive marketing and advertising campaigns to cement the association of safety and reliability with its GMC and Chevrolet brand automobiles, including Class Vehicles.

63.    GM designs, manufactures, markets, and sells Class Vehicles, and has, at all times, uniformly branded the Class Vehicles as safe and dependable.

### A.    The Class Vehicles' Defective Infotainment System

64.    Class Vehicles are equipped with an "IOR Audio System," a 7-inch diagonal "Infotainment System," which included a multi-touch display, AM/FM stereo, Bluetooth phone connection, rearview image display, and other features. Class Vehicles only include models equipped with this same Defective Infotainment System.

65.     At all times, by design, the Defective Infotainment System and all of its components are operational when a driver is piloting the Vehicle.

66.    The Class Vehicles' infotainment system suffers from a fundamental defect causing it to rapidly increase the volume to maximum without driver input and while the vehicle is in motion. Specifically, as GM admitted in the December 2019 and March 2020 Bulletins, the "radio volume may ramp up to maximum without input to the volume controls." Based on GM's own admission the failure was likely caused by a "software anomaly" within the infotainment

17

system's programming. However, other consumers have reported that replacing the screen, wiring, or computer module may remedy the issue, suggesting a possible defect in materials or workmanship.

67.     The Defective Infotainment Systems in the Class Vehicles were inadequately programmed, manufactured, and/or incorporated to operate under the conditions it was intended by Defendant to operate. The Defective Infotainment System in the Class Vehicles exposes occupants and others to extreme danger, bodily injury, or even death. When radio volume unexpectedly and rapidly spikes to the maximum level, without warning and while the vehicle is being operated on streets or highways, it creates a heightened risk for collision. Likewise, a driver that is startled, surprised, or distracted by the rapid volume increase resulting from the Defective Infotainment System may cause death or bodily injury to other drivers on the road. Indeed, Plaintiff Boddison was startled due to the Defective Infotainment System rapidly increasing to maximum volume and nearly suffered a collision as a result.

68.     Occasionally, the infotainment system screen will go black but continue to play audio through the speakers. When this occurs, the driver cannot manipulate the touch screen or physical buttons to turn off the audio. The driver also looses feedback from safety systems, the instrument cluster, and other essential features. This condition may persist even after the vehicle is shut off and the driver exits. This condition subjects Class Vehicles to risk of a prematurely drained battery, which places the driver and occupants at risk of being stranded without an operable vehicle and leaving them exposed to the elements, a safety concern.

69.     The Defective Infotainment System will also periodically reboot while the vehicle is in motion and, upon restarting, will play the volume of the radio or navigation system at maximum. This presents a hazard as the infotainment screen displays necessary information to the driver and is intended to remain displayed to the driver unless the rearview image is displayed as part of a backup event. Often, the only way to resolve the volume issue and eliminate the noise is to pull the vehicle to the side of the road, open and close the driver's side door, and restart the vehicle as the following NHTSA complaint describes. This process leaves the driver and vehicle occupants exposed to heightened risk of collision and serious bodily injury from passing vehicles. A NHTSA complaint from October 11, 2019 details this concern:



70.     The sudden loss of image display on the infotainment screen presents a hazard as the driver can no longer see necessary information or interact with the infotainment screen. When the infotainment screen loses the image, the entire system fails to function as intended by Defendant and cannot be operated by the driver. In many cases, a driver must pull to the side of the road, turn off the ignition, open and shut the driver's side door, and restart the vehicle to eliminate the volume spike or resolve a black screen, or reboot loop. This leaves the vehicle

occupants vulnerable to oncoming traffic while stopped and at risk of being hit by a fast-moving vehicle. No reasonable consumer anticipates that such a process would be necessary to eliminate a distracting and disorienting condition emanating from the infotainment system.

71.    The Class Vehicles' infotainment system is similarly defective because the rearview image display remains in some cases for an unreasonable time, sometimes 30-50 seconds, after the driver has shifted from "Reverse" to "Drive" regardless of whether the vehicle has reached a speed of 10mph or traveled a continuous duration of 10 meters. This condition violates the NHTSA mandate requiring that the rearview image "shall not be displayed after the backing event has ended." This defective condition violates 49 CFR § 571.111 et. seq. a regulation intended to increase the safety of vehicle occupants and pedestrians. Consumers have also reported issues with the rearview image display being so bright that they cannot see out the windows at night, or even black screens following a shift from "Reverse."

72.    The rearview image display is an essential component of the Defective Infotainment System and is faulty. This condition creates unnecessary confusion to the driver who is likely to believe the vehicle is in reverse when it actually is in drive. If the driver accelerates while in "Drive" while believing the vehicle remains in reverse gear due to the display, it will increase the likelihood of collision or injury. The failure of the rearview image display to resolve when the vehicle is put into "Drive" even after it travels 10 meters or reaches 10 mph violates safety requirements mandated by NHTSA for all vehicles manufactured after May 1, 2018. 49 C.F.R. § 571.111 S62.4. GM has known of issues related to the rearview image display for years preceding the filing of this Complaint but has been unable or unwilling to resolve the issue.

73.    Additionally, the Bluetooth communication system of the Defective Infotainment Systems does not work as represented by GM because when an incoming call is answered the ringer intermittently does not cease and instead remains at the same volume throughout the call and can be heard by both the caller and the vehicle operator. During these times, the operator

concludes the call, and the ringing sound will persist, at volume, even after the vehicle is shut off. To terminate the sound, the vehicle operator must turn off the ignition, open and close the vehicle door, and reengage the ignition. Only after these steps are completed will the ringing sound cease.

74.     The persistent ringing noise emanating from the Defective Infotainment System creates a dangerously distracting and disorienting environment for the driver while the vehicle is in motion and cannot be stopped until the driver turns off the ignition exits the vehicle and reengages the ignition.

75.     Further still, the Infotainment System displays or allows the driver to interact with crucial safety information, interfaces with the vehicles cameras, sensors, signals, instrument cluster, and steering wheel controls as well as OnStar connectivity that a driver would use to call for roadside assistance in the case of an emergency.

76.     Accordingly, the Defective Infotainment System in the Class Vehicles exposes occupants and others to extreme danger, even death.

77.     Class Vehicles suffer from a uniform defect which causes the Defective Infotainment System to operate in a manner that renders the vehicle unsafe. Compounding the issue, drivers are not protected from these safety risks by a disclosure warning prospective purchasers and lessees of the likelihood of the Defective Infotainment System to rapidly maximize volume.

78.     The Defective Infotainment Systems causes vehicles to become dangerous to operate while on the road, and therefore they are not fit for their ordinary purpose.

**B.     GM Knew About the Defective Infotainment System but Continued to Manufacture, Market, and Sell Class Vehicles.**

79.     GM knew or should have known about the Defective Infotainment System, but it concealed or failed to disclose the defect and continued to manufacture, market, and sell Class Vehicles. Specifically, GM knew or should have known the Class Vehicles needed radios

without the defect in the Defective Infotainment Systems, but it failed to provide corrective action.

80.     GM knew or should have known about the Defective Infotainment System at least as soon as the prerelease process of designing, manufacturing, engineering, and testing the Class Vehicles. During these phases, GM would have gained comprehensive and exclusive knowledge about the Defective Infotainment Systems, particularly the basic principles behind the construction and function of the Defective Infotainment Systems. However, GM failed to act on that knowledge and instead installed the Defective Infotainment Systems in the Class Vehicles, and subsequently marketed and sold the vehicles to unsuspecting consumers without disclosing the safety risk or warning Class members of the defective condition.

81.     Federal law requires automakers like GM to be in close contact with NHTSA regarding potential defects.[5] Accordingly, GM is legally obligated to (and does) monitor NHTSA databases for consumer complaints regarding their automobiles as part of their obligation to identify potential defects in their vehicles, such as the Defective Infotainment System and the NHTSA website is replete with complaints from owners and lessees of Class Vehicles detailing issues with the infotainment systems across makes and models and dating from before Plaintiffs purchased their Class Vehicles.

---

[5] *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000)

82.     The following examples are typical of the many complaints to be found on NHTSA's website regarding the Defective Infotainment System across Class Vehicles:



83.   Consumer Reports has also published consumer complaints regarding the Defective Infotainment Systems equipped in Class Vehicles. For example, in the case of the Chevrolet Colorado:[6]



84.   Each of the following yearly reports, including the 2020 model years identifies the same issues with the equipped infotainment systems:[7]



85.   GM also monitors automotive forums and blogs on the internet and occasionally even interacts with drivers on those forums. On November 27, 2018 a user posted on GM-Trucks.com that she was having issues with the infotainment system on her newly purchased 2019 GMC Sierra:



---

[6] https://www.consumerreports.org/cars/chevrolet/colorado/2016/reliability/?pagestop
[7] https://www.consumerreports.org/cars/chevrolet/colorado/2020/reliability

86.     The following day GM customer service interacted with her, apologizing for the issues with her infotainment system.8 Ten pages of posts detailing unresolved issues with other driver's infotainment systems followed, with the latest complaint being posted on December 13, 2020. A true and correct copy of the forum post and responses is attached hereto as Exhibit D. Accordingly, GM has long been on notice of the issue and two years after this post was published, drivers are still complaining, and GM is still unable to resolve the issues detailed herein.



87.     Additional examples abound, in April of 2019 a user posted concerns about the Defective Infotainment System on cartalk.com, a popular and publicly available forum used to discuss automobiles. On April 11, 2019 user 'Terry29' posted:9



---

8 https://www.gm-trucks.com/forums/topic/217103-screen-black/page/1/#comments
9 https://community.cartalk.com/t/2019-chevrolet-colorado-radio-issues/138343

88.     Accordingly, GM was, or should have been, aware of the Defective Infotainment System and associated safety concerns since well before Plaintiffs purchased their vehicles in April 2019, August 2019, and October 2019.

89.     Additionally, GM knew about the Defective Infotainment System through its own investigation. On information and belief, GM performed extensive surveys and conducted numerous field investigations that it later used to generate the technical service bulletins that identified the issue. However, GM failed to act on that knowledge by warning Class members or by identifying a repair or replacement part.

90.     At the time of the filing of Plaintiffs' initial Complaint, GM had not identified a remedy for the Defective Infotainment System, stating only that "Engineering is analyzing the issue.  Please do not replace any parts for this concern.  Additional information will be made available once analysis is complete." On October 12, 2020, Defendant began offering for distribution what it purports to be a software solution to fix the Defective Infotainment System; in spite of Defendant's claim, and as noted above, Plaintiffs report that the issues described above continue to manifest in the Class Vehicles at the same rate or have become more frequent.

91.     No further update has been made since the October 2020 Update, which did not resolve the issues with the Defective Infotainment System. Thus, whether there will be a corrective repair, if so, when, and whether it will fix the problem are all unknown. Further still, GM has not instructed its dealers to display the bulletin, or to disclose the Defective Infotainment System, to purchasers and lessees at the time of sale. By so omitting this material information, GM intends that purchasers and lessees of the Class Vehicles rely on the omission to induce them into purchasing the vehicle at an unjustified price.

92.     Despite GM's extensive knowledge regarding the existence and dangerous condition of the Defective Infotainment System, GM failed to act on that knowledge by warning Class members at the time of sale or after. Sacrificing consumer safety for profits, GM instead

chose to enrich itself by using false and misleading marketing to sell the Class Vehicles as functional, safe, and durable at inflated prices.

C.      **GM Touted the Class Vehicles as Safe and Dependable, Concealing the Defective Infotainment System from Consumers.**

93.      GM's overarching marketing message for the Class Vehicles was that the vehicles are safe and dependable. This marketing message is false and misleading given the propensity of the Defective Infotainment Systems in the Class Vehicles to create a safety issue by rapidly and without warning increasing the volume to maximum, losing the Infotainment System's functionality, improper functioning of the rearview image display, and other issues complained of herein, thereby increasing the risk of a crash.

94.      GM is one of the ten biggest advertising spenders in the United States and much of that advertising budget goes toward promoting its brands as safe and dependable. GM's main website touts the safety features of its vehicles, attempting to induce potential customers to purchase or lease the Class Vehicles.

95.      On GM's consumer facing websites for its GMC and Chevrolet brands, there is a page describing the Company's leadership that repeats its consistent and pervasive marketing message that GM vehicles are safe and dependable. As early as at least May 2017, the Chevrolet website stated "At Chevrolet, the safety of drivers and passengers is of high priority. That's why we offer a comprehensive and innovative approach to safety aimed at helping you make your drive safer before, during and after a collision."

96.      GM has consistently touted the safety of its vehicles.  At the filing of the initial Complaint in this action, the Chevrolet site stated: "Nothing is more important than feeling confident and secure when you're on the road. That's why your safety and well-being are at the core of everything we do. And with a wide range of available features and technologies, our vehicles are constantly working to help you drive as safely as possible."[10] (emphasis added)

_____

[10] https://www.chevrolet.com/safety (retrieved on September 3, 2020)

97.     And Defendant continues to represent its commitment to customer safety in its advertising materials. As they currently note on their website for Chevrolet branded vehicles as recently as December 15, 2020, Defendant tells its customers that "[their] safety and well-being are at the core of everything we do.  Because we always have you in mind, our vehicles offer advanced technology to help you drive as safely as possible."[11]  As such, GM's Chevrolet and GMC websites currently contain and have contained these representations at all relevant times during the Class Period.

98.     In addition to its representations about GMC and Chevrolet vehicles generally, GM's websites for their GMC and Chevrolet brands contain specific representations about safety on the pages for specific models of the Class Vehicles.

99.     For example, webpages of various models of the Class Vehicles include multiple photographs and descriptions advertising the safety systems of the 2021 GMC models, as well as 2021 Chevrolet models. On information and belief, similar representations were made about the 2019 and 2020 models of the Class Vehicles, at issue here, when they were being marketed on the GMC and Chevrolet websites. Those sections list an array of safety features such as airbags, side impact protection, as well as advanced safety features like rear-facing cameras, lane assist, and forward collision alert.

100.     A car with a Defective Infotainment System that can increase to maximum volume at any time, without warning, and while the vehicle is in operation on streets and highways resulting in surprise and distraction to the driver, as do the Class Vehicles, and thereby exposes its occupants to the risk of injury or death is not a safe car. Thus, GM's marketing of the Class Vehicles as safe is false and misleading and omits facts that would be material to consumers such as Class members who purchased or leased Class Vehicles because they were consistently marketed as having the utmost safety on the road.

---

[11] https://www.chevrolet.com/safety (retrieved on December 16, 2020); similar representations are made by GM with regard to GMC vehicles at:
   https://www.gmc.com/index/miscellaneous/safety.html#vehicle-lineup.html

101.    Likewise, the other manifestations of the defect in the Defective Infotainment systems similarly render the Class Vehicles unsafe.

102.    Similar representations to those that GM made on the GMC and Chevrolet websites were also included in brochures for the Class Vehicles, at the dealership level, and throughout GM's other messaging about the Class Vehicles.

103.    GM marketed the Class Vehicles as safe and dependable, and the Infotainment Systems as functional, but failed to disclose the existence of issues associated with the Defective Infotainment System and/or that the Class Vehicles were not safe or dependable. Specifically, GM:

      a.    Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Defective Infotainment System, despite its knowledge of the performance issues;

      b.    Failed to disclose, at and after the time of purchase, lease, and/or service, the Class Vehicles' Defective Infotainment Systems were defective and not fit for their ordinary purpose, despite its knowledge; and

      c.    Failed to disclose and actively concealed the existence and pervasiveness of the Defective Infotainment System, despite its knowledge.

104.    GM's deceptive marketing and willful and knowing failure to disclose the Defective Infotainment System damaged, and continues to damage, Plaintiff and Class members. If Plaintiff and Class members had known of the Defective Infotainment System and/or that the Class Vehicles were not safe and durable, they would not have purchased or leased the Class Vehicles or certainly would have paid less to do so.

**D.    Applicable Warranties**

105.    GM sold and leased the Class Vehicles with express written warranties.

106.    For the GMC branded Class Vehicles, GM offered a written express "bumper-to-bumper" warranty covering GMC brand vehicles for 36 months or 36,000 miles covering all components (except normal wear and tear). Defendant states the that "Repairs will be made to correct any defect in materials or workmanship."

107.    Likewise, for the Chevrolet branded Class Vehicles, GM also offered a written express "bumper-to-bumper" warranty covering Chevrolet brand vehicles for 36 months or 36,000 miles covering all components (except normal wear and tear).  Defendant also states the that "Repairs will be made to correct any defect in materials or workmanship."

108.    The December 2019 Bulletin instructed service personnel not to attempt a repair while the March 2020 Bulletin, and October 2020 Bulletin each contain a "warranty claim codes" or equivalent, i.e., a code for technicians to use when conducting warranty-based repairs despite being fielded for the same purpose, i.e. to notice defects with the Infotainment System.

109.    Moreover, GM's affirmative representations regarding the operation, functionality, dependability, and safety of the Class Vehicles containing the Defective Infotainment Systems creates an express warranty regarding the same.

110.    Because GM is a merchant with respect to the goods at issue, all vehicles which it sells are accompanied by the implied warranty of merchantability which guarantees that GM vehicles will be fit for the ordinary purposes for which the vehicle will be used.

111.    GM provides the express warranty to buyers and lessees on the window sticker of all vehicles that it sells and purchasers and lessees rely on that warranty when deciding whether or not to purchase the vehicle and at what price to purchase the vehicle.

112.    However, GM breached these warranties, as it admitted in NHTSA Technical Service Bulletin PIT5722, when it reported it did not have a repair for the Defective Infotainment System, when it declined to repair or replace the Defective Infotainment System when customers brought the Class Vehicles to authorized repair facilities and/or dealerships for a remedy, and when its purported October 2020 "fix" failed to resolve the issues described

herein and in fact made them worse, with Plaintiffs Hathorne and Hogan, and members of the putative classes, actually experiencing an increase in the frequency of the issues described above.

## V.    CLASS ACTION ALLEGATIONS

113.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.

114.    Plaintiff Boddison seeks to represent a Florida statewide class ("Florida Class") defined as:

> All current and former owners and/or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Florida within the applicable statute of limitations.

115.    Plaintiff Hawthorne seeks to represent a California statewide class ("California Class") defined as:

> All current and former owners and/or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of California within the applicable statute of limitations.

116.    Plaintiff Hogan seeks to represent a Missouri statewide class ("Missouri Class") defined as:

> All current and former owners and/or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Missouri within the applicable statute of limitations.

117.    Plaintiffs collectively seek to represent a Nationwide class ("National Class") defined as:

> All current and former owners and/or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the United States within the applicable statute of limitations.

118.    Excluded from the State and National Classes ("Classes") are GM and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.

Plaintiff reserves the right to modify or amend definitions of the Classes, and to add additional classes and sub-classes, as appropriate, during the course of this litigation.

119.    This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

120.    Numerosity – Federal Rule of Civil Procedure 23(a)(1). The members of the Classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiff is informed and believes that there are not less than at least approximately 500,000 members of the Classes, the precise number of Class members is unknown to Plaintiff but may be ascertained from GM's books and records. National and Statewide Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

121.    Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3). This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

a.    whether GM's alleged conduct violates applicable law;

b.    whether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c.    whether GM made false or misleading statements and/or material omissions about the quality and safety of the Class Vehicles;

d.    whether the Class Vehicles contain the Defective Infotainment System;

e.    whether GM had actual or implied knowledge about the alleged defect but failed to disclose it to Plaintiff and the other members of the Classes;

f.   whether GM's omissions and concealment regarding the quality of the Class Vehicles were likely to deceive the Statewide Class members in violation of the state consumer protection statutes alleged herein;

g.   whether GM breached its express warranties with respect to the Class Vehicles;

h.   whether GM breached its implied warranties with respect to the Class Vehicles;

i.   whether the members of the Classes overpaid for their Class Vehicles as a result of the defect alleged herein;

j.   whether the members of the Classes are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

k.   the amount and nature of relief to be awarded to Plaintiff and the other members of the Classes.

122.   Typicality – Federal Rule of Civil Procedure 23(a)(3). Plaintiffs' claims are typical of the claims of the other members of the Classes because Plaintiffs and the members of the Classes purchased or leased Class Vehicles that contain Defective Infotainment Systems, as described herein. Neither Plaintiffs nor the other members of the Classes would have purchased the Class Vehicles or would have as much as they did for the Class Vehicles, had they known of the Defective Infotainment System. Plaintiffs and the other members of the Classes suffered damages as a direct proximate result of the same wrongful practices in which GMC engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other members of the Classes.

123.   Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4). Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes that she seeks to represent. Plaintiffs have retained counsel

competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The interests of the members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

124.    Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2). GM has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the National and Statewide Class members as a whole.

125.    Superiority – Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM, so it would be impracticable for the other members of the Classes to individually seek redress for GM's wrongful conduct. Even if these Class members could afford individual litigation, the court system could not. Individual litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device, as intended by Congress, presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT ONE

### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,
### Fla. Stat. §§ 502.201, *et seq.*
### (Individually and on Behalf of the Florida Class and Florida Extended Warranty Sub-Class)

126.    Plaintiff Boddison ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

127.    Plaintiff brings this cause of action on behalf of herself and on behalf of the Florida Class (the "Class" for purposes of this Count).

128.    By the conduct described in detail above and incorporated herein, GM engaged in unfair or deceptive acts in violation of F.S.A. § 501.204.

129.    GM's omissions regarding the Defective Infotainment System, described above, that results in the Defective Infotainment System rapidly increasing in volume without warning or input from the driver, random rebooting, loss of functionality, failure of the rearview image display to resolve and other issues described herein are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

130.    GM intended for Plaintiff and the other Class members to rely on GM's omissions regarding the Defective Infotainment System.

131.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon GM's misrepresentations and omissions of fact concerning the Defective Infotainment System, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

132.    Had GM disclosed all material information regarding the Defective Infotainment System to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

133.    GM's misrepresentations and omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

134.    GM's provision of and subsequent refusal to honor their warranty obligations with respect to the Defective Infotainment System is a deceptive act and practice because GM induced customers into purchasing or leasing Class Vehicles by leading them to believe that any defects that were identified in the vehicle would be repaired under the applicable warranty.

35

When presented with requests to repair the Defective Infotainment Systems, GM declined to repair the Class Vehicles or reimburse customers.

135.    In addition to being deceptive, the business practices of GM were unfair because GM knowingly sold Plaintiff and the other Class members Class Vehicles with Defective Infotainment Systems that are essentially unusable for the purposes for which they were sold. GM's business practices are further unfair because they provision consumers of Class Vehicles with vehicles that do not conform with NHTSA safety mandates and refuse to correct that nonconformity through the applicable warranties. The injuries to Plaintiff and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff and the other Class members or to competition under all of the circumstances. Moreover, in light of GM's exclusive knowledge of the Defective Infotainment System, the injury is not one that Plaintiff or the other Class members could have reasonably avoided.

136.    GM's business practices were further unfair and deceptive in that it misrepresented to consumers that their vehicles would not be repaired under warranty when they had no remedy for the issue but then attached warranty codes to the March 2020 Bulletin and October 2020 Bulletin for service personnel to make repairs under warranty. Further still, GM attempted to repair, at no cost, the 2020 vehicles, but never disclosed to 2019 owners that they could take their vehicles in for warranty repairs related to the Defective Infotainment Systems.

137.    As a direct and proximate result of GM's unfair and deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Defective Infotainment System been disclosed. Plaintiff and the other Class members also suffered diminished value and lose of use of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under F.S.A. §§ 501.201, et seq.

## COUNT TWO

### BREACH OF EXPRESS WARRANTY
### Fla. Stat. §§ 672.313 and 680.21
### (Individually and on Behalf of the Florida Class)

138.    Plaintiff Boddison ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

139.    Plaintiff brings this cause of action on behalf of herself and on behalf of the Florida Class and Florida Extended Warranty Sub-Class (the "Class" for purposes of this Count) as a result of Defendant's breach of its express warranties.

140.    GM is and was at all relevant times a merchant with respect to the Class Vehicles.

141.    In its New Vehicle Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period. GM provides the following language in its 2019 and 2020 Chevrolet Limited Warranty guide:

> This warranty is for Chevrolet vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
> The warranty covers repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period…

Warranty repairs, including towing, parts, and labor, will be made at no charge.

142.    On information and belief, GM's warranty for GMC branded Class Vehicles mirrors the language included above for GM's Chevrolet branded Class Vehicles.

143.    GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the Defective Infotainment System.

144.    GM breached the express warranty to repair defects in materials and workmanship within the Class Vehicles. GM has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

145.    Plaintiff notified GM of the Defective Infotainment System, and its corresponding breach of warranties, when she brought her vehicle to Cox Chevrolet for repair of the Defective Infotainment System. Plaintiff also notified GM directly and on August 4, 2020 Chevrolet Customer Service declined to compensate Plaintiff for the defect or to repair the Defective Infotainment System. GM was also provided notice of the Defective Infotainment System through numerous complaints lodged by consumers directly to GM and through its dealers, as well as its own internal engineering knowledge.

146.    Furthermore, the Limited Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

147.    At all times that General Motors warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe. The Class Vehicles were defective when General Motors delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiff and the Class.

148.    General Motors's resellers, dealers, and distributors are intermediaries between General Motors and consumers.  These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against General Motors with respect to Plaintiff's and all other Class members' acquisition of Class Vehicles. General Motors's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

149.    Plaintiff and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand,

and General Motors, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between General Motors and their resellers, authorized dealers, and, specifically, of General Motors's implied warranties.

150.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies allowable by law.

151.    Also, and as alleged in more detail herein, at the time that GM warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and GM improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

152.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to GM's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class members' remedies would be insufficient to make them whole.

153.    As a direct and proximate result of GM's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT THREE

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Fla. Stat. §§ 672.314 and 680.212
### (Individually and on Behalf of the Florida Class)

154.    Plaintiff Boddison ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

39

155.    Plaintiff Boddison brings this claim individually and on behalf of the Florida class and Florida Extended Warranty Sub-Class (the "Class," for purposes of this Count) as a result of Defendant's breach of the implied warranty of merchantability.

156.    GM is a "merchant" and the Class Vehicles are "goods" as defined in Fla. Stat. §§ 672.104 and 672.105.

157.    Pursuant to Fla. Stat. §§ 672.314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the sale or lease of the product.  GM impliedly warranted that the Class Vehicles were of a merchantable quality.

158.    By placing the Class Vehicles in the stream of commerce, GM impliedly warranted that the Class Vehicles are safe, and that all claims in their advertising and marketing of the Class Vehicles were true.

159.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale or lease and at all times thereafter, the Class Vehicles were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are equipped with a Defective Infotainment System that distracts and disorients the driver increasing the likelihood of a collision and jeopardizing the health and safety of Class Vehicle occupants and the driving public.

160.    Further, GM has refused to provide an adequate warranty repair for the Defective Infotainment System, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to the Defective Infotainment Systems have been denied adequate repair. The result is that GM has sold consumers Class Vehicles that do not satisfy NHTSA safety regulations and GM refuses to conform those vehicles to the NHTSA mandates.

161.    Plaintiffs and the other Class members suffered injuries due to the defective nature of the Class Vehicles and GM's breach of the warranty of merchantability.

162.    At all times that GM warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing, marketing, or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe.  The Class Vehicles were defective when GM delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiffs and the Class.

163.    GM's resellers, dealers, and distributors are intermediaries between General Motors and consumers.  These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against General Motors with respect to Plaintiff's and all other Class members' acquisition of Class Vehicles.  GM's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

164.    Plaintiffs and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiffs and all other members of the Class, on the one hand, and GM, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between GM and their resellers, authorized dealers, and, specifically, of GM's implied warranties.

165.    As a direct and proximate result of GM's breach of implied warranties of merchantability, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT FOUR

### VIOLATION OF CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code §§ 1750, et. seq.
### (Individually and on Behalf of the California Class)

166.    Plaintiff Hawthorne ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

41

167.   Plaintiff brings this cause of action on behalf of himself and on behalf of the California Class (the "Class," for purposes of this Count).

168.   Defendant is a "person" as defined by California Civil Code § 1761(c).

169.   Plaintiff and the California Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased the Class Vehicles for personal, family, or household use.

170.   The sale of the Class Vehicles to Plaintiff and the putative Class members is a "transaction" as defined by California Civil Code § 1761(e).

171.   Defendant's acts and practices, which were intended to result, and which did result, in the sale of the Class Vehicles, violate § 1770 of the Consumer Legal Remedies Act for at least the following reasons:

   a.   Defendant represented that the Class Vehicles have characteristics, uses or benefits which they do not have;

   b.   Defendant advertised goods with intent to not sell them as advertised;

   c.   Defendant represented that its products are of a particular standard, quality, or grade when they are not; and

   d.   Defendant represented that its goods have been supplied in accordance with a previous representation when they have not.

172.   By failing to disclose and concealing the defective nature of the Class Vehicles from Plaintiff and the prospective class members, Defendant violated California Civil Code § 1761(a), as it represented that the Class Vehicles had characteristics and benefits that they do not have and represented that the Class Vehicles and their infotainment systems were of a particular standard, quality, or grade when they were of another.   See Cal. Civ. Code §§ 1770(a)(5), (7), (9), and (16).

173.    Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

174.    Defendant knew that the Class Vehicles suffered from an inherent defect, were defectively assembled, designed, or manufactured, and were not suitable for their intended use. This defect was found in each of the Class Vehicles at purchase or lease but may have not been discovered by putative class members until months, or years, after the purchase. Indeed, Defendants knew, or should have known, based on customer and dealer reports, that the Class Vehicles contained a defect that presents a substantial danger of bodily injury or death.

175.    As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and /or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the defect, Plaintiff and the class members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

176.    Defendant was under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles and/or associated repair costs because Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles and Plaintiff and the class members could not reasonably have been expected to learn or discover that their vehicles had a dangerous safety defect until it manifested.

177.    In failing to disclose the defective nature of the Class Vehicles prior to, or during, the time of transaction, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

178.    A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiff and the Class Members to be important in deciding whether to purchase or lease the Class Vehicles or pay less for them and were material. Had Plaintiff and

the class members known of the defective nature of the Class Vehicles, they would not have purchased or leased the vehicles or would have paid less for them.

179.    Plaintiff and the Class Members are reasonable consumers who do not expect their vehicles to suddenly lose access to the information displayed on the Infotainment System, lose the ability to interact with the infotainment system, or be subjected to unanticipated volume spikes that cannot be remedied without pulling the vehicle over and shutting it off, without warning and while underway.  This is the reasonable and objective consumer expectation relating to consumer automobiles and their interface systems.

180.    As a result of Defendant's conduct, Plaintiff and the Class Members were harmed and suffered actual damages in that the Class Vehicles experienced and will continue to experience a failure for the main information and interactivity interface in the vehicle to fail and to distract drivers.

181.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the Class Members suffered and will continue to suffer actual damages. Had Defendants disclosed the true nature and/or danger in its vehicles, Plaintiff and members of the Class would not have been misled into purchasing Defendants' vehicles or would have paid significantly less for them.

182.    Plaintiff, on behalf of himself and all other similarly situated California consumers, and as appropriate, on behalf of the general public of the State of California, seeks injunctive relief prohibiting Defendants from continuing these unlawful practices pursuant to California Civil Code § 1782(a)(2), and such other equitable relief, including restitution of either (1) the full purchase or lease price paid by customers who purchased a Class Vehicle, or (2) a portion of the purchase or lease price paid by customers who purchased or leased a Class Vehicle reflecting the difference in value as compared to a vehicle without the defect.

183.    Plaintiff provided Defendants with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a) via certified mail demanding that Defendants correct such

violations. If Defendants fail to respond to the letter within 30 days Plaintiff will amend his complaint to seek damages and attorneys' fees as allowed by the CLRA.

## COUNT FIVE

### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT
### Cal. Civ. Code § 1790, *et seq.*
### (Individually and on Behalf of the California Class)

184.    Plaintiff Hawthorne ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

185.    Plaintiff brings this cause of action on behalf of himself and on behalf of the California Class (the "Class," for purposes of this Count) as a result of Defendants' breach of its express and implied warranties.

186.    Plaintiff is a buyer, as Civil Code section 1791, subdivision (b), defines the term "buyer."

187.    The Class Vehicles are consumer goods, as Civil Code section 1791, subdivision (a), defines the term "consumer good." The Class Vehicles are new motor vehicles, as Civil Code section 1793.22, subdivision (e)(2) defines the term "new motor vehicle."

188.    Defendants were, at all times relevant hereto, the manufacturer, distributor, warrantor, lessor, and/or seller of the Class Vehicles.  Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

189.    Plaintiff leased a Class Vehicle from Defendant and Defendant provided Plaintiff and the Class Members with a standard express written warranty covering the Class Vehicles which states, in part, that:

190.    In its New Vehicle Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period. GM provides the following language in its Chevrolet Limited Warranty guide:

> This warranty is for Chevrolet vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

The warranty covers repairs to correct any vehicle defect related to materials or workmanship occurring during the warranty period…

Warranty repairs, including towing, parts, and labor, will be made at no charge.

191.    On information and belief, GM's warranty for GMC branded Class Vehicles mirrors the language included above for GM's Chevrolet branded Class Vehicles.

192.    GM's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the Defective Infotainment System.

193.    Upon being learning of the Defective Infotainment System, Plaintiff contacted his dealer and took his vehicle to Defendants' authorized repair facility but was informed that, as of the date of the repair request, no repair was available aside from the update that had already been installed on Plaintiff's vehicle and failed to remedy the issue. Because Defendant had issued an over-the-air update meant to repair the defective condition and that update failed to resolve the issue, any further repair attempts by GM or its authorized repair facility would be futile.

194.    Plaintiff and the Class Members were harmed because they leased or purchased a vehicle and paid the full purchase or lease price of those vehicles but were denied the benefit of their bargain due to the defect. Plaintiff and members of the Class relied on the existence of a warranty when purchasing or leasing their vehicles and paid more for them based on GM's promise to repair them.

195.    Defendants failure to equip the vehicles with a functioning and reliable Infotainment System, and failure to repair the Defective Infotainment System such that the vehicle conformed with the express warranty was a substantial factor in Plaintiff's, and the Class Members', harm.

196.    Defendants are unable to conform the vehicle to the express warranties despite being afforded a reasonable opportunity to do so by Plaintiff.

197.    Under the Song-Beverly Consumer Warranty Act, all express warranties are accompanied by the implied warranty of merchantability, which may not be disclaimed by the manufacturer or retail seller.

198.    Defendant was, at all times relevant hereto, the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.

199.    Defendant provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they are sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from an inherent defect at the time of sale and thereafter are not fit for their particular purpose of providing safe and reliable transportation.

200.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, among other things: (1) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (2) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

201.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective.

202.    At all times that General Motors warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe. The Class Vehicles were defective when General Motors delivered them to their resellers, dealers, and distributors which sold the

Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiff and the Class.

203.    General Motors's resellers, dealers, and distributors are intermediaries between General Motors and consumers.  These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against General Motors with respect to Plaintiff's and all other Class members' acquisition of Class Vehicles. General Motors's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

204.    Plaintiff and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and General Motors, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between General Motors and their resellers, authorized dealers, and, specifically, of General Motors's implied warranties.

205.    Defendants' breach of express and implied warranties was willful and has deprived Plaintiff and the Class Members of the benefit of their bargain.

206.    Defendant has had multiple reasonable opportunities to cure its breach, but either can not or will not do so due to conditions reasonably with their control. Per the Song-Beverly Consumer Warranty Act, if the manufacturer is unable to conform a New Motor Vehicle to the express warranty, then the manufacturer shall promptly replace the vehicle with one that conforms to the express warranty or reimburse the buyer. Defendants have done neither despite being informed that the Class Vehicles are defective and do not conform with applicable warranties and cannot be made to by GM.

207.    Defendants' breach of express and implied warranties was willful and has deprived Plaintiff and the Class Members of the benefit of their bargain.

208.    As a direct and proximate cause of Defendants' breach of express and implied warranties, Plaintiff and the Class Members sustained damages and other losses in an amount to be determined at trial.  Defendants' conduct damaged Plaintiff and the Class Members, who are entitled to recover under section 1794 of the act, including civil penalties, actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other such relief the Court deems appropriate.

## COUNT SIX

### VIOLATION OF FALSE ADVERTISING LAW
### Cal. Bus. & Pro. Code § 17500, *et seq*.
### (Individually and on Behalf of the California Class)

209.    Plaintiff Hawthorne ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

210.    Plaintiff brings this cause of action on behalf of himself and on behalf of the California Class (the "Class," for purposes of this Count).

211.    General Motors has benefitted from intentionally selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to General Motors's concealment of the Defective Infotainment System, and Plaintiff and the other members of the Class have overpaid for these vehicles as a result.

212.    Defendants publicly disseminated advertising and promotional material that was designed and intended to convey to the public that the Class Vehicles, and their infotainment systems, were safe, reliable, and operated as consumers would expect the Class Vehicles to operate.

213.    Defendant also advertised that they would repair vehicles under warranty but refused to do so until recently.

214.    Defendant was aware, or should have been aware, of the Defective Infotainment System at the time Plaintiff and members of the Class purchased or leased the Class Vehicles.

49

215.    Defendant negligently, or intentionally, made representations in its advertisements but, due to issues they were aware of, did not sell vehicles that conformed with the representations and promises in their publicly disseminated advertisements.

216.    General Motors has unjustly received and retained benefits from Plaintiff and the other members of the Class, which contrary to equity and good conscience.

217.    It is inequitable and unconscionable for GM to retain these benefits.

218.    Because GM wrongfully concealed its misconduct, Plaintiff and the other members of the Class were not aware of the facts concerning the Class Vehicles and did not benefit from Defendant's misconduct.

219.    General Motors knowingly accepted the unjust benefits of its wrongful conduct.

220.    As a result of Defendant's misconduct, Plaintiff and the other members of the Class suffered an injury-in-fact and lost money and/or property in an amount to be proven at trial.

<u>**COUNT SEVEN**</u>

**VIOLATION OF UNFAIR COMPETITION LAW**
**Cal. Civ. Code § 17200, *et seq*.**
**(Individually and on Behalf of the California Class)**

221.    Plaintiff Hawthorne ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

222.    Plaintiff brings this cause of action on behalf of himself and on behalf of the California Class (the "Class," for purposes of this Count).

223.    As a result of their reliance on Defendant's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.  Additionally, as a result of the defect, Plaintiff and the Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

224.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

225.    Plaintiff and the members of the Class are reasonable consumers who do not expect their vehicles to suffer from the issues associated with the Defective Infotainment Systems described herein.

226.    Defendants' knew the Class Vehicles suffered from inherent defects, were defectively assembled, designed, or manufactured, would fail prematurely, and were not suitable for their intended use.

227.    In failing to disclose the Infotainment System Defect, and misrepresenting its true characteristics, Defendants' have knowingly or intentionally concealed material facts and breached their duty not to do so.

228.    Defendants were under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles and/or associated repair costs because Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles and Plaintiff and the class members could not reasonably have been expected to learn or discover that the Class Vehicles had a dangerous safety defect until it manifested.

229.    A reasonable consumer would have considered the facts Defendants concealed or did not disclose to Plaintiff and the Class Members to be important in deciding whether to purchase or lease the Class Vehicles or pay less for them and that such facts were material. Had Plaintiff and the class members known of the defective nature of the Class Vehicles, they would not have purchased or leased the vehicles or would have paid less for them.

230.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report problems.  Indeed, Defendant continues to cover up and conceal the true nature of the problem. Defendant has not disclosed to Plaintiff or members of

51

the Class that recent updates intended to remedy the Defective Infotainment Systems do not work as intended and the Class Vehicles remain victim to the Defective Infotainment Systems.

231.    Defendants' acts, conduct, and practices were fraudulent, in that they constituted business practices and acts that were likely to deceive reasonable members of the public. Defendant has long known of the deficiencies associated with the Defective Infotainment System and continued to conceal those facts from consumers while making affirmative misrepresentations regarding the Class Vehicles and their infotainment systems. Defendants acts, conduct, and practices were fraudulent because they are immoral, unethical, oppressive, unscrupulous, and/or are substantially injurious to consumers.

232.    Defendants' acts, conduct, and practices were unfair, in that they constituted business practices and acts the utility of which does not outweigh the harm to consumers. Defendants' business acts and practices were further unfair in that they offend established public policy, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

233.    GM's business practices were further unfair and deceptive in that it misrepresented to consumers that their vehicles would not be repaired under warranty when they had no remedy for the issue but then attached warranty codes to the March 2020 Bulletin and October 2020 Bulletin for service personnel to make repairs under warranty. Further still, GM attempted to repair, at no cost, the 2020 vehicles, but never disclosed to 2019 owners that they could take their vehicles in for warranty repairs related to the Defective Infotainment Systems.

234.    A business practice is unlawful if it is forbidden by any law. Defendant's acts, conduct, and practices were unlawful, in that they constituted:

a.      Violations of the California Consumer Legal Remedies Act;

b.      Violations of the Song-Beverly Consumer Warranty Act;

c.      Violations of the False Advertising Law;

d.      Violations of the Florida Unfair and Deceptive Trade Practices Act;

e.      Violations of 49 C.F.R. § 571.111 S62.4;

f.      Violations of the Missouri Merchandising Practices Act;

g.      Violations of Magnuson-Moss Consumer Warranty Act; and

h.      Violations of the express and implied warranty provisions of California Commercial Code sections 2313 and 2314.

235.    By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

236.    Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

237.    As a direct and proximate result of Defendant's unfair and deceptive practices, Plaintiff and the Class have suffered and will continue to suffer actual damages.

238.    Defendant has been unjustly enriched and should be required to make restitution to Plaintiff and the Class pursuant to §§ 17203 and 17204 of the Business & Professions Code. Plaintiff and members of the class also seek injunctive relief as deemed appropriate by the Court.

## COUNT EIGHT

### VIOLATIONS OF MISSOURI'S MERCHANDISING PRACTICES ACT
**Mo. Rev. Stat. § 401.010, *et seq*.**
**(Individually and on Behalf of the Missouri Class)**

239.    Plaintiff Hogan ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

240.     Plaintiff brings this cause of action on behalf of himself and on behalf of the California Class (the "Class," for purposes of this Count).

241.     This Count is brought on behalf of Plaintiff and the Missouri Class ("Class" for the purposes of this Count) for violation of Missouri's Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 et seq., which prohibits deceptive acts or practices in the conduct of any business, trade or commerce in Missouri.

242.     The MMPA provides a private right of action for "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri."  Mo. Stat. §§ 407.020.1; 407.025.1.

243.     Plaintiff and members of the Missouri Class purchased their Class Vehicles within the State of Missouri for personal, family or household use.

244.     By the conduct described in detail above and incorporated herein, Defendants engaged in deceptive trade practices.

245.     Defendants' misrepresentations and omissions regarding the Defective Infotainment System, described above, which causes the issues outlined above, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

246.     Defendants intended for Plaintiff and the other Class members to rely on their misrepresentations and omissions regarding the Defective Infotainment System.

247.     Plaintiff and the other Class members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described Defective Infotainment System, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles. The Class members acted as reasonable consumers in light of all circumstances and the acts Defendants committed in violation of Section 407.020 would cause a reasonable person to enter into the transactions that caused the damages at issue. Plaintiff and members of the Class are

capable of showing damages can be proved with a reasonable degree of certainty using objective evidence.

248.    GM's business practices were further unfair and deceptive in that it misrepresented to consumers that their vehicles would not be repaired under warranty when they had no remedy for the issue but then attached warranty codes to the March 2020 Bulletin and October 2020 Bulletin for service personnel to make repairs under warranty. Further still, GM attempted to repair, at no cost, the 2020 vehicles, but never disclosed to 2019 owners that they could take their vehicles in for warranty repairs related to the Defective Infotainment Systems.

249.    Had Defendants disclosed all material information regarding the Defective Infotainment System to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

250.    Defendants' omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class. Defendant intentionally harmed Plaintiff and members of the Class without just cause or acted with deliberate and flagrant disregard for the safety of others.

251.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Defective Infotainment System been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, inconvenience damages, civil penalties, punitive damages, attorneys' fees and costs, equitable relief, and all other relief allowed under Mo. Rev. Stat. § 407.010, et seq.

## COUNT NINE

**BREACH OF EXPRESS WARRANTY**
**Mo. Rev. Stat. § 400.2-313**
**(Individually and on Behalf of the Missouri Class)**

252.    Plaintiff Hogan ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

253.    Plaintiff brings this claim individually and on behalf of the other members of the Missouri Class (the "Class" for purposes of this Count).

254.    General Motors is a merchant with respect to the Class Vehicles.

255.    In its written express warranties, General Motors expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

256.    General Motors's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the Defective Infotainment System.

257.    In its New Vehicle Limited Warranty, GM expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period. GM provides the following language in its Chevrolet Limited Warranty guide:

> This warranty is for Chevrolet vehicles registered in the United States and normally operated in the United States and Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.
> The warranty covers repairs to correct any vehicle defect related to materials or workmanship    occurring    during    the    warranty    period…

Warranty repairs, including towing, parts, and labor, will be made at no charge.

258.    On information and belief, GM's warranty for GMC branded Class Vehicles mirrors the language included above for GM's Chevrolet branded Class Vehicles.

259.    General Motors breached its express warranty to repair defective parts in the Class Vehicles. GM has not repaired the Class Vehicles' Defective Infotainment System.

260.    Plaintiff notified General Motors of the Defective Infotainment System in the Class Vehicles when he contacted his dealer and GM customer service while he was within the warranty period. He also notified General Motors when he brought his vehicle in for the October update and again after he brought his vehicle in to report that the October update had failed. General Motors knew that it was unable to provide adequate remedy under the warranty. General Motors was also provided notice of the Defective Infotainment System through numerous complaints filed against it directly and through its dealers, publicly available complaints, as well as its own internal engineering knowledge. General Motors has not remedied its breach.

261.    Further, General Motors has refused to provide an adequate warranty repair for the Defective Infotainment System, thus rendering the satisfaction of any notice requirement futile. As stated above, customers, including Plaintiff, that have presented their vehicles for warranty repair due to Defective Infotainment System have been denied adequate repairs.

262.    The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because General Motors has failed and/or has refused to adequately provide effective remedies within a reasonable time.

263.    At all times that General Motors warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe. The Class Vehicles were defective when General Motors delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiff and the Class.

264.    General Motors's resellers, dealers, and distributors are intermediaries between General Motors and consumers.  These intermediaries sell Class Vehicles to consumers and are

not, themselves, consumers of Class Vehicles, and therefore have no rights against General Motors with respect to Plaintiff's and all other Class members' acquisition of Class Vehicles. General Motors's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

265.    Plaintiff and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and General Motors, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between General Motors and their resellers, authorized dealers, and, specifically, of General Motors's implied warranties.

266.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

267.    Also, as alleged in more detail herein, at the time that General Motors warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and General Motors improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the General Motors Vehicles under false pretenses.

268.    General Motors had notice of its breach as alleged herein.

269.    As a direct and proximate result of General Motors's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT TEN

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Mo. Rev. Stat. Code § 400.2-314
### (Individually and on Behalf of the Missouri Class)

270.    Plaintiff Hogan ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

271.    Plaintiff brings this Count individually and on behalf of the other members of the Missouri Class (the "Class," for purposes of this Count).

272.    General Motors is a "merchant" and each Class Vehicle is a "good" as defined in Missouri's Commercial Law governing the implied warranty of merchantability.  Mo. Rev. Stat. § 400.2-104, 2-105.  Pursuant to Mo. Rev. Stat. §§ 400.2-314 and 400.2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought, sold, and leased subject to an implied warranty of merchantability.

273.    By placing the Class Vehicles in the stream of commerce, General Motors impliedly warranted that the Class Vehicles are safe, and that all claims in their advertising and marketing of the Class Vehicles were true.

274.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale or lease and at all times thereafter, the Class Vehicles were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which the vehicles were used. Specifically, the Class Vehicles suffer from the Defective Infotainment System which causes the issues outlined above, and for which GM has been unable to field an adequate remedy.

275.    Further, General Motors has refused to provide an adequate warranty repair for the Defective Infotainment System, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to the Defective Infotainment System have been denied adequate repair.

276.     Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and General Motors 's breach of the implied warranty of merchantability.

277.     At all times that General Motors warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe. The Class Vehicles were defective when General Motors delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiff and the Class.

278.     General Motors's resellers, dealers, and distributors are intermediaries between General Motors and consumers.  These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against General Motors with respect to Plaintiff's and all other Class members' acquisition of Class Vehicles. General Motors's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

279.     Plaintiff and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and General Motors, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between General Motors and their resellers, authorized dealers, and, specifically, of General Motors's implied warranties.

280.     General Motors had notice of its breach as alleged herein.

281.     As a direct and proximate result of General Motors's breach of implied warranties of merchantability, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT ELEVEN

### FRAUDULENT OMISSION
### (Individually and on Behalf of the Florida Class)

282.    Plaintiff Boddison ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

283.    Plaintiff this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

284.    GM was aware of the Defective Infotainment System within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

285.    Having been aware of the Defective Infotainment System within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Defective Infotainment System, GM had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

286.    GM did not disclose the Defective Infotainment System within the Class Vehicles to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

287.    For the reasons set forth above, the Defective Infotainment System within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

288.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on GM to disclose known material defects with respect to the Class Vehicles.

289.    Had Plaintiff and the other members of the Class known of the Defective Infotainment System within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

290.    Through its omissions regarding the Defective Infotainment System within the Class Vehicles, GM intended to induce, and did induce, Plaintiff and the other members of the

Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

291. As a direct and proximate result of GM's omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Defective Infotainment System had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

## COUNT TWELVE

### UNJUST ENRICHMENT
### (Individually and on Behalf of the National and State Classes)

292. Plaintiffs incorporate by reference each allegation as if fully set forth herein.

293. Plaintiff brings this Count individually and on behalf of the National Class, the Florida Class, the California Class, and the Missouri Class (the "Classes," for purposes of this Count).

294. GM has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to GM's concealment of the Defective Infotainment System, and Plaintiffs and the members of the Classes have overpaid for these vehicles.

295. GM has received and retained unjust benefits from Plaintiffs and the other members of the Classes, and inequity has resulted.

296. It is inequitable and unconscionable for GM to retain these benefits.

297. Because GM concealed its fraud and deception, Plaintiffs and the other members of the Classes were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

298. GM knowingly accepted the unjust benefits of its wrongful conduct.

299.    As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the members of the Classes in an amount to be proven at trial.

## COUNT THIRTEEN
### NEGLIGENCE

**(Individually and on Behalf of the National and State Classes)**

300.    Plaintiffs incorporate by reference each allegation as if fully set forth herein.

301.    Plaintiffs bring this Count individually and on behalf of the members of the National, Florida, California, and Missouri Classes (the "Classes," for purposes of this Count).

302.    Defendant owed a duty to Plaintiffs and members of the Classes to provide a vehicle that conformed with its publicly disseminated representations, its warranties, and promotional information given to Plaintiff and members of the Classes at the time of the respective transactions.

303.    Defendant harmed Plaintiffs and members of the classes by negligently manufacturing, designing, testing, engineering, and incorporating the Defective Infotainment System into the Class Vehicles. Defendant further harmed Plaintiffs and the putative Classes by fielding a software update that does not remedy the issues complained of herein but instead exacerbates them. Had Defendant properly implemented and tested the purported software fix, Plaintiffs and members of the putative Classes would not be subjected to increased danger as a result.

304.    Defendant's negligence was a substantial and necessary factor in causing Plaintiff and members of the classes harm and it was foreseeable by Defendant that Plaintiff and members of the classes would be harmed by negligently manufacturing, designing, testing, engineering, and incorporating the Defective Infotainment System into the Class Vehicles.

305.     As a result of Defendant's negligence, Plaintiffs and members of the Classes are entitled to recover damages in an amount to be proven at trial, and such other relief as the Court may deem appropriate.

## COUNT FOURTEEN
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. §§ 2301, et seq.
### (Individually and on Behalf of the National and State Classes)

306.     Plaintiffs incorporate by reference each allegation as if fully set forth herein.

307.     Plaintiffs bring this Count individually and on behalf of the members of the National, Florida, California, and Missouri Classes (the "Classes," for purposes of this Count).

308.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a) and (d).

309.     Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

310.     Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

311.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

312.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

313.     In its express written warranties, Defendant expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects become apparent during the warranty period.

314.     Defendant's warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

315.     With respect to Class members' purchases or leases of the Class Vehicles, the terms of Defendant's written warranties and implied warranty became part of the basis of the bargain between GM and Plaintiff and other Class members

316.     Defendant breached the implied warranty of merchantability. Without limitation, the Class Vehicles have Defective Infotainment Systems, as described above, which renders the Class Vehicles unmerchantable.

317.     Defendant breached its express warranties by not offering a functioning repair for the Defective Infotainment System in the Class Vehicles as evidenced by GM's own admission in the Bulletin that it has not identified a remedy.

318.     Further, Defendant has refused to provide an adequate warranty repair for the Defective Infotainment System, thus rendering the satisfaction of any notice requirement futile. Class members reported the Defective Infotainment System failure to their dealer, but GM has failed to repair the defect.

319.     At the time of sale or lease of each Class Vehicle, Defendant knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defective Infotainment System.

320.     The amount in controversy of Plaintiffs' individual claims exceeds the sum of $25. The amount in controversy in this action exceeds the sum of $50,000.00 exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit.

321.     Plaintiffs, individually and on behalf of the Class members, seek all damages permitted by law in an amount to be proven at trial.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for relief and judgment as follows:

A.      For an order declaring that this action is properly maintained as a class action and appointing Plaintiffs as representatives for the Class, and appointing Plaintiffs' counsel as Class counsel;

B.      That Defendant bears the costs of any notice sent to the Classes;

C.      For an order awarding Plaintiffs and the members of the Classes actual damages, consequential and incidental damages, inconvenience damages, economic damages, restitution, and/or disgorgement;

D.      For an order enjoining Defendant from continuing to engage in the unlawful and unfair business acts and practices as alleged herein;

E.      For an order awarding Plaintiffs and the members of the Classes pre- and post-judgment interest;

F.      For an order awarding attorneys' fees and costs of suit, including expert's witness fees as permitted by law; and

G.      Such other and further relief as this Court may deem just and proper.

## VII.   JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all of the claims asserted in this Complaint so triable.

DATED: December 18, 2020                  Respectfully submitted,

FINKELSTEIN & KRINSK LLP

By: /s/ John J. Nelson

John J. Nelson, Esq. (*pro hac vice*)
Keia James Atkinson, Esq.
501 West Broadway, Suite 1260
San Diego, CA 92101

Christopher M. Hittel, Esq.
Ryan Hittel, Esq.
HITTEL LAW, P.A.
333  Sixth Avenue West
Bradenton, FL 34205

*Attorneys for Plaintiffs and
 the Putative Class*